STATE of Wisconsin, Plaintiff-Respondent,

v.

Donald J. McGUIRE,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2007AP2711–CR. Oral argument January 5, 2010.
—Decided July 20, 2010.*

2010 WI 91

(Also reported in 786 N.W.2d 227.)

293

For the defendant-appellant-petitioner there were briefs by *Robert R. Henak* and the *Henak Law Office, S.C.,* Milwaukee, and oral argument by *Robert R. Henak.*

For the plaintiff-respondent the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals, *State v. McGuire,* No. 2007AP2711–CR, unpublished slip op. (Wis. Ct. App. May 20, 2009), affirming a judgment of the Walworth County Circuit Court, James L. Carlson,

Judge. Father Donald J. McGuire (McGuire) was charged in 2005 with five counts of indecent behavior with a child, in violation of Wis. Stat. § 944.11(2) (1965–66). The charges were based on acts that McGuire committed between 1966 and 1968. Although prosecutions under § 944.11(2) are subject to the six-year statute of limitations under Wis. Stat. § 939.74(1) (2007–08),[1] the statute of limitations was tolled while McGuire was not publicly a resident of Wisconsin. Wis. Stat. § 939.74(3).[2] A jury convicted McGuire on all five counts.

¶ 2. McGuire filed a postconviction motion that the circuit court denied. The court of appeals affirmed. In this court, McGuire raises four issues: (1) whether the tolling provision of Wis. Stat. § 939.74(3) is unconstitutional as applied to the facts of this case; (2) whether charges were barred by due process because of the roughly 36 years that passed between the offenses and the charges; (3) whether reversal in the interest of justice under Wis. Stat. § 751.06 is appropriate; and (4) whether McGuire was denied effective assistance of counsel.

¶ 3. We conclude that Wis. Stat. § 939.74(3) is constitutional as applied to the facts of this case. It does not violate the Privileges and Immunities, Due Process, or Equal Protection provisions of the United States Constitution. Section 939.74(3) does not burden a fundamental right, and it is rationally related to the legitimate governmental interests of detecting crimes and apprehending criminals.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[2] Wisconsin Stat. § 939.74(3) has been part of the Wisconsin Criminal Code since December 1955.

¶ 4. We next conclude that the charges were not barred by due process. McGuire has failed to allege an improper motive or purpose on the part of the State, which is a necessary prerequisite for dismissal based on pre-indictment delay.

¶ 5. We also are satisfied that McGuire received a fair trial in which the real controversy was fully tried and justice has not for any reason miscarried. Therefore, reversal in the interest of justice is inappropriate.

¶ 6. Finally, we reject McGuire's contention that he was denied effective assistance of counsel. The two decisions of trial counsel that McGuire claims constituted deficient performance were part of a reasonable trial strategy.

¶ 7. For the reasons set forth, we affirm the court of appeals.

## I. BACKGROUND AND PROCEDURAL HISTORY

¶ 8. The facts are disputed, but the evidence at trial showed the following: McGuire was a Jesuit priest who taught at the Loyola Academy in Wilmette, Illinois, a suburb of Chicago. The priests who taught at the school lived in a residence attached to the school. Loyola Academy was not a boarding school, and students do not live on the campus. Students were permitted in the Jesuits' residence only for limited purposes, such as helping to carry a package.

¶ 9. Victor B. was 13 years old when he began attending Loyola in the fall of 1966. McGuire offered to counsel and tutor Victor, who was having trouble in school. McGuire then had Victor live with him in his residence at Loyola. While living in the room, Victor would sleep in the same bed as McGuire, often in the nude. The two began giving each other body massages, which included touching each others' genitals.

¶ 10. During this time, McGuire became acquainted with Victor's uncle, Harry B. In the spring of 1967, McGuire began visiting Harry's cottage in Fontana, Wisconsin. While McGuire and Victor were in Wisconsin—whether they were riding in the car or at the cottage—McGuire would give Victor what he referred to as "horse bites," which he would perform by grabbing Victor below his groin and brushing his hand over Victor's genitals. The "horse bites" continued through the summer of 1968.

¶ 11. Sometime around November of 1967, McGuire visited the Fontana cottage while Victor was there. The only other person at the cottage at that time was Victor's grandmother. While Victor was in bed, McGuire entered the room, and Victor pretended to be asleep. McGuire put his hands down Victor's pants and squeezed his testicles and penis to wake him up.

¶ 12. In the fall of 1968, Victor returned to Loyola Academy but stopped living in McGuire's room. The sexual contact stopped at that time.

¶ 13. Sean C. was 14 years old when he began attending Loyola Academy in August of 1968. Because Sean was having problems getting to school, he was sent to see McGuire for guidance counseling. McGuire suggested that Sean stay at Loyola to avoid the problem of getting to school in the morning. McGuire told Sean to tell his father that he was sleeping in McGuire's guidance office, when in fact Sean was staying in bed with McGuire. Sean testified that McGuire took steps to hide the fact that Sean was living with McGuire.

¶ 14. While Sean was staying in McGuire's room, the two began to give each other massages. During these massages, McGuire would touch Sean's penis and have Sean touch his.

¶ 15. McGuire took Sean on several trips. Sometime between Thanksgiving and Christmas of 1968, the two travelled together to the Fontana cottage on a Friday. Sean was 14 years old at the time. On Friday night at the Fontana cabin, McGuire began massaging Sean's penis with baby oil. He then changed positions and told Sean to do the same to him. The next night, the two performed the same acts again.

¶ 16. Sean continued to live with McGuire during his freshman year at Loyola. He would stay in McGuire's room roughly four nights a week, and sexual contact occurred nearly every day. During the summer, McGuire and Sean traveled to Europe, and sexual contact occurred on this trip. In the fall, Sean returned to living with McGuire, and the sexual contact continued.

¶ 17. In February of 1970, Sean reported the sexual contact to Father Charles Schlax. Later, several Jesuits—Father Renke, the president of Loyola; Father Beall, the principal; and Father Humbert, the headmaster—interviewed Sean. Sean's father attended this meeting. After Sean left the meeting, his father told him that he would not return to Loyola, and Sean was transferred to a different school. Neither the school nor Sean's father contacted the police.

¶ 18. In June of 2003, Sean contacted an attorney about the sexual contact with McGuire. On August 1, 2003, Sean filed a civil lawsuit against the Jesuits and McGuire.

¶ 19. In August of 2003, Victor received a letter from the headmaster of Loyola Academy about reports of sexual misconduct. After he did some research, Victor contacted Sean's attorney, who put him in touch with Sean. According to Victor and Sean, they did not know each other before they spoke on the phone in 2003. During their phone conversation, Sean obtained some

information about the Fontana cottage, but both Victor and Sean later denied having discussed what McGuire had actually done to either of them or the layout of McGuire's room at Loyola.

¶ 20. On February 7, 2005, a criminal complaint was filed in Walworth County charging McGuire with two counts of indecent behavior with a child, in violation of Wis. Stat. § 944.11(2) (1965).[3] The complaint was later amended to add three additional counts.

¶ 21. A four-day jury trial began on February 19, 2006. Victor and Sean both testified at trial; McGuire did not. The jury found McGuire guilty on all five counts.

¶ 22. McGuire filed a motion for postconviction relief asking for dismissal of charges or, alternatively, a new trial. He argued, inter alia, that the statute of limitations tolling provision in Wis. Stat. § 939.74(3) was unconstitutional, reversal was warranted in the interest of justice, and the charges were barred by due process. He also raised an ineffective assistance of counsel claim based on the decision of his trial counsel, Gerald Boyle, not to investigate Harry B.'s wife, Elita, who would testify regarding Harry's unwillingness to give out keys to the Fontana cottage. Finally, he argued that a new trial was warranted because McGuire discovered after trial that Robert Goldberg, who McGuire had known previously, would have testified that he saw Sean and Victor together shortly after they graduated from high school.[4] After a hearing on the ineffective assistance of counsel claim, the court denied the motion.

_____

[3] Wis. Stat. § 944.11 (1965–66) provided: "Any of the following may be imprisoned not more than 10 years: . . . (2) whoever takes indecent liberties with the privates of any person under the age of 18."

[4] In response to the State's claim that McGuire's trial counsel knew about Goldberg, McGuire also argued that if trial

¶ 23. McGuire appealed, raising four arguments: (1) the charging delay violated his constitutional rights; (2) he received ineffective assistance of counsel; (3) the circuit court erroneously admitted other acts evidence; and (4) the circuit court erroneously allowed rebuttal evidence. The court of appeals affirmed the circuit court on all four issues.

¶ 24. McGuire petitioned this court for review, which we granted on September 10, 2009.

## II. STANDARD OF REVIEW

¶ 25. The constitutionality of a statute is a question of law, which we review de novo. *State v. Cole,* 2003 WI 112, ¶ 10, 264 Wis. 2d 520, 665 N.W.2d 328. Statutes are presumed to be constitutional, and a party challenging a statute's constitutionality must demonstrate that it is unconstitutional beyond a reasonable doubt. *State v. Baron,* 2009 WI 58, ¶ 10, 318 Wis. 2d 60, 769 N.W.2d 34. This presumption and burden apply to as-applied constitutional challenges to statutes as well as to facial challenges. *State v. Wood,* 2010 WI 17, ¶ 15, 323 Wis. 2d 321, 780 N.W.2d 63.

¶ 26. Whether a defendant's right to due process was violated also presents a question of law that we review de novo. *State v. Shiffra,* 175 Wis. 2d 600, 605, 499 N.W.2d 719 (1993).

¶ 27. We review an ineffective assistance of counsel claim as a mixed question of fact and law. *State v. Doss,* 2008 WI 93, ¶ 23, 312 Wis. 2d 570, 754 N.W.2d

counsel had known about the evidence, his failure to investigate and call Goldberg constituted ineffective assistance of counsel.

150. We uphold the circuit court's factual findings unless they are clearly erroneous, but review de novo whether an attorney's performance was constitutionally deficient. *Id.*

## III. DISCUSSION

¶ 28. McGuire raises four issues, which we address in turn. First, we address whether the statute of limitations tolling provision of Wis. Stat. § 939.74(3) is unconstitutional as applied to the facts of this case. Second, we address whether due process barred the filing of charges roughly 36 years after McGuire committed the offenses. Third, we address whether reversal is appropriate in the interest of justice. Fourth, we address whether McGuire was denied effective assistance of counsel at trial.

A. Constitutionality of Wis. Stat. § 939.74(3)

¶ 29. McGuire first argues that the statute of limitations tolling provision contained in Wis. Stat. § 939.74(3) is unconstitutional as applied to the facts of this case. He argues that it violates the Privileges and Immunities, Equal Protection, and Due Process provisions of the United States Constitution and their analogues in the Wisconsin Constitution.[5]

¶ 30. With certain exceptions, "prosecution for a felony must be commenced within 6 years . . . after the commission thereof." Wis. Stat. § 939.74(1). However,

---

[5] "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2. The Fourteenth Amendment reads in relevant part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall

301

"[i]n computing the time limited by this section, the time during which the actor was not publicly a resident within this state . . . shall not be included." Wis. Stat. § 939.74(3). It is undisputed that McGuire was not publicly a resident of Wisconsin at any point since the commission of the offenses.

¶ 31. This court addressed the constitutionality of Wis. Stat. § 939.74(3) in *State v. Sher,* 149 Wis. 2d 1, 437 N.W.2d 878 (1989). The defendant in *Sher,* a public resident of Florida, was charged with theft two years after the six-year statute of limitations had run. *Id.* at 7. He argued that § 939.74(3) was unconstitutional as applied to the facts of his case because it violated both the Privileges and Immunities Clause and the Equal Protection Clause. *Id.* at 10.

¶ 32. The court first addressed Sher's privileges and immunities claim. It noted that the clause does not require "absolute equality" between residents and non-residents and permits disparate treatment because nonresidents "may present special problems for the administration of state laws." *Id.* at 11 (citing *Taylor v. Conta,* 106 Wis. 2d 321, 329, 316 N.W.2d 814 (1982)). The court then applied a three-part test to determine whether a statute is constitutional under the Privileges and Immunities Clause:

> First, this court must consider whether the statute disadvantages nonresidents as compared to residents. If there is a disadvantageous treatment of nonresidents, then this court examines the statute under the second step; whether the discrimination violates a fundamental right. Finally, if a fundamental right is

any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. IV; *see also* Wis. Const. art. I, §§ 1, 8.

infringed, this court must decide if the means employed [by the statute] bear a substantial relation to legitimate state objectives.

*Id.* at 11 (alteration in original) (internal citations and quotation omitted).

¶ 33. The court acknowledged that § 939.74(3) "disadvantages" nonresidents because only public residents of Wisconsin could claim the benefit of the statute. *Id.* at 12. It then rejected the defendant's argument that § 939.74(3) burdened a fundamental right, reasoning that statute of limitations defenses are not fundamental rights. *Id.* (citing *Bendix Autolite Corp. v. Midwesco Enters.*, 486 U.S. 888, 893 (1988)). *See also Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945).

¶ 34. Although the court did not need to inquire further, it went on to explain that a "substantial reason for discrimination" between nonresidents and residents existed:

We find the provision is substantially related to several legitimate state objectives: the identification of criminals, the detection of crimes, and the apprehension of criminals. Investigation of crimes is easier for law enforcement officials when people central to the incident, and who may have vital information, are located within the state. . . . Even if suspects are located, local law enforcement agencies may not possess enough resources to send someone to question or investigate the suspect who resides outside of Wisconsin. In such cases, Wisconsin authorities might have to rely on the resources of other state's police and could burden those other departments. In addition, cases which would be important here, may be given less attention if other authorities were responsible for investigation. Furthermore, if a suspect is charged, apprehension of them is

easier if they are public residents than if they reside out of state.

*Sher,* 149 Wis. 2d at 14.[6]

¶ 35. The *Sher* court next addressed the constitutionality of § 939.74(3) under the Equal Protection Clause. *Id.* at 15. Because § 939.74(3) did not burden a fundamental right, the court inquired into whether the legislature made an "irrational or arbitrary classification." *Id.* (quoting *State v. Bleck,* 114 Wis. 2d 454, 468, 338 N.W.2d 492 (1983)). It reasoned that, because § 939.74(3) was "substantially related" to the state's interest in detecting crimes and identifying and apprehending criminals, the statute also was rationally related to those interests, as the "rationally related" test was a lesser standard than the "substantially related" test. *Id.* at 16.

¶ 36. McGuire argues that *Sher* is not controlling because *Sher* was decided as a facial challenge, not an as-applied challenge. He asserts that this case is distin-

---

[6] Two decades have passed since the *Sher* decision, but we see no reason to alter its fundamental conclusions. *State v. Sher,* 149 Wis. 2d 1, 437 N.W.2d 878 (1989). This court has explained that statutes of limitation promote fair and prompt litigation and protect defendants from stale or fraudulent claims "brought after memories have faded or evidence has been lost." *Korkow v. General Cas. Co. of Wis.,* 117 Wis. 2d 187, 198, 344 N.W.2d 108 (1984) (citation omitted). However, some offenses have never had statutes of limitation; the legislature has lengthened statutes of limitation in certain cases, particularly cases involving minors; and scientific evidence such as DNA has frequently neutralized the argument that claims should not proceed because evidence is unreliable. Because the tolling provision in Wis. Stat. § 939.74(3) long predated the offenses in this case, we see little or no basis for an argument that McGuire has a fundamental right to a statute of limitations defense.

304

guishable from *Sher* for two reasons: (1) in this case, § 939.74(3) burdened his fundamental right to present a defense; and (2) on these facts, § 939.74(3) does not accomplish the statutory objectives set out in *Sher.* As we see it, the facts of this case are similar to the facts in *Sher,* and, as with *Sher,* § 939.74(3) is constitutional as applied to these facts.[7]

¶ 37. First, the tolling of the statute of limitations did not deprive McGuire of the right to present a defense. Although McGuire casts the deprivation under the tolling provision as a deprivation of the right to present a defense, § 939.74(3) deprived him only of the right to a statute of limitations defense. *Id.* His argument, if taken to its natural conclusion, would suggest that the constitution *requires* statutes of limitation in certain cases, lest defendants be deprived of their right to present a defense. Yet, statutes of limitation are not constitutionally required. Wisconsin has no statutes of limitation for certain crimes,[8] while some states have no statutes of limitations for any criminal offense.[9] The extent to which the passage of time burdens a fundamental right is a separate constitutional question independent of the constitutionality of § 939.74(3).

---

[7] Although the court in *Sher* discussed the broad constitutionality of Wis. Stat. § 939.74(3), Sher specifically argued that the statute was unconstitutional as applied to him. *Sher,* 149 Wis. 2d at 10 ("Sher's counsel contends he is not arguing that the tolling provision is unconstitutional on its face. Rather, he argues that the provision may be unconstitutionally applied in this case."). For a thorough discussion of the difference between "facial" challenges and "as-applied" challenges, *see State v. Wood,* 2010 WI 17, 323 Wis. 2d 321, 780 N.W.2d 63.

[8] These include several forms of homicide and sexual assault of a child. Wis. Stat. § 939.74(2)(a).

[9] *See, e.g. Bush v. State,* 193 P.3d 203, 221 (Wyo. 2008).

¶ 38. Second, McGuire distinguishes *Sher* on the grounds that none of the statutory objectives described in *Sher* applies to him. He argues that the interests of identifying criminals, detecting crimes, and apprehending criminals are not furthered by applying § 939.74(3) to these facts, because McGuire did not flee justice and was easy to locate.

¶ 39. In truth, however, the facts in this case are closely related to identifying criminals, detecting crimes, and investigating those crimes. When McGuire either transported a minor from Illinois to Wisconsin or met an Illinois minor in Wisconsin, he was able to engage in unlawful sexual activity with minors away from co-workers at Loyola Academy who were more likely to notice impropriety. Correspondingly, because neither McGuire nor the victims were residents of Wisconsin, McGuire's sporadic visits to the state made the detection of his crimes by Wisconsin authorities and the reporting of his crimes by the minor victims to Wisconsin authorities, much less likely.

¶ 40. The relevant facts here are analogous to the facts in *Sher*. In *Sher*, the circuit court found as fact that the defendant "never left Wisconsin in an attempt to conceal or prevent knowledge of his whereabouts" and that "information was available to both private parties and law enforcement officials as to his residency status and whereabouts." *Id.* at 7. On those facts, this court still concluded that § 939.74(3) bore substantial relation to the objectives described in that case.

¶ 41. The fact that a defendant was not in hiding and did not flee justice does not render § 939.74(3) unconstitutional as applied to him. Law enforcement agencies still may lack the resources to investigate a suspect outside the state; they may have to rely on the resources of police departments in other states, burden-

306

ing those departments; and reliance on police departments in other states may result in lesser importance being given to investigating if other authorities are responsible for the investigation. *See Sher,* 149 Wis. 2d at 14. These state interests would satisfy the constitutional requirements of the Privileges and Immunities Clause regardless of the fact that they may not be compelling in a given case.

¶ 42. McGuire also argues that Wis. Stat. § 939.74(3) is unconstitutional because it violates the Due Process and Equal Protection Clauses. Because § 939.74(3) neither interferes with a fundamental right nor disadvantages a suspect class, we apply rational basis review to both the equal protection and due process claims. *See State v. Jorgensen,* 2003 WI 105, ¶¶ 32–33, 264 Wis. 2d 157, 667 N.W.2d 318 (describing the similarities between due process and equal protection analysis); *see also State v. Annala,* 168 Wis. 2d 453, 468, 484 N.W.2d 138 (1992).

¶ 43. McGuire again distinguishes *Sher* on the grounds that he is bringing an as-applied challenge, not a facial challenge. His argument, however, ignores the fact that the "basic formulation" of the rational basis test is the same in both facial and as-applied challenges. *Smith v. City of Chicago,* 457 F.3d 643, 652 (7th Cir. 2006). Under this standard, the constitution requires only that the statute creating a classification be "rationally related to a valid legislative objective." *Jorgenson,* 264 Wis. 2d 157, ¶ 33 (quoting *State v. McManus,* 152 Wis. 2d 113, 130–31, 447 N.W.2d 654 (1989)). The distinction between public residents and public nonresidents set out in Wis. Stat. § 939.74(3) is rationally related to the legitimate government interests of iden-

tifying criminals, detecting crimes, and apprehending criminals. Therefore, § 939.74(3) is constitutional under both the Equal Protection and Due Process Clauses.

B. Due Process Claim Based on Passage of Time

¶ 44. McGuire next argues that the charges against him were barred by due process. He argues that the 36–year passage of time between the commission of the offenses and the charges prejudiced his defense because critical witnesses died and evidence was destroyed.

¶ 45. "The statute of limitations is the principal device . . . to protect against prejudice arising from a lapse of time between the date of an alleged offense and an arrest." *State v. Wilson,* 149 Wis. 2d 878, 903, 440 N.W.2d 534 (1989) (citing *United States v. Lovasco,* 431 U.S. 783, 788–89 (1977)). Nonetheless, the statute of limitations is not the sole measure of a defendant's rights with respect to pre-indictment delay, and "the Due Process Clause has a limited role to play in protecting against oppressive delay." *Lovasco,* 431 U.S. at 789. Wisconsin has adopted a two-part test to determine whether pre-indictment delay constitutes a due process violation:

> Where a defendant seeks to avoid prosecution based upon prosecutorial delay, it is clear that it must be shown that the defendant has suffered actual prejudice arising from the delay and that the delay arose from an improper motive or purpose such as to gain a tactical advantage over the accused.

*Wilson,* 149 Wis. 2d at 904–05 (quoting *State v. Rivest,* 106 Wis. 2d 406, 418, 316 N.W.2d 395 (1982)). This

court recently reaffirmed *Wilson,* holding that a defendant claiming a due process violation based on pre-indictment delay must show: "(1) actual prejudice as a result of delay; and (2) the delay arose out of an improper purpose, [such as to] give the State a tactical advantage over the defendant." *State v. MacArthur,* 2008 WI 72, ¶ 45, 310 Wis. 2d 550, 750 N.W.2d 910 (citing *State v. Dabney,* 2003 WI App 108, ¶ 30, 264 Wis. 2d 843, 663 N.W.2d 366).

¶ 46. McGuire acknowledges his inability to "establish that the delay resulted from some improper *prosecutorial* motive" or purpose. Instead he argues that *Wilson* "misconstrued the authorities upon which it relied." McGuire cites three United States Supreme Court cases that he claims *Wilson* misconstrued. A close examination of those cases reveals that *Wilson* properly interpreted and applied those cases.

¶ 47. McGuire first argues that *Wilson* misconstrued *United States v. Marion,* 404 U.S. 307 (1971). In *Marion,* the Court explicitly declined to address "when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution." *Id.* at 324. Therefore, *Marion* neither supports nor contradicts the holding in *Wilson*—it simply did not address the issue decided in *Wilson.*

¶ 48. McGuire next argues that *Wilson* misconstrued *Lovasco.* In *Lovasco,* the defendant based his due process claim on a 17–month delay during an investigation. *Lovasco,* 431 U.S. at 787. The Court explained that "investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused.'" *Id.* at 795 (quoting *Marion,* 404 U.S. at 324). It then held that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have

been somewhat prejudiced by the lapse of time." *Id.* at 796. The Court left "to the lower courts . . . the task of applying the settled principles of due process that we have discussed to the particular circumstances of individual cases." *Id.* at 797.

¶ 49. Thus, although *Lovasco* explicitly left the application of its rule under specific facts to future courts, it refused to find a due process violation based upon the facts of the case—in which the state did not seek a tactical advantage. The Court's language supports a distinction between prosecutions that are delayed because of an improper state motive and those that are delayed for other reasons.

¶ 50. Finally, McGuire argues that *Wilson* misconstrued *United States v. Gouveia,* 467 U.S. 180 (1984). In *Gouveia,* the Court addressed the right to counsel for prisoners in administrative segregation awaiting indictment on federal charges. *Id.* at 182. Addressing the concern that prosecutors might delay charges because the defendants were already in prison, the Court noted that a defendant still has a due process claim "if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense." *Id.* at 192 (citing *Lovasco,* 431 U.S. at 789–90).

¶ 51. Like *Lovasco, Gouveia* clearly described the basic requirements of the Due Process Clause. The *Wilson* court did not "misconstrue" *Lovasco* and *Gouveia,* but applied the due process requirements set out in those cases. Indeed, *Wilson* is consistent with *Lovasco*'s refusal to "adopt a rule which would [require prosecutors to charge as soon as they had evidence of guilt] absent a clear constitutional command to do so." *Lovasco,* 431 U.S. 795.

¶ 52. Federal circuit court precedent confirms that *Wilson* correctly interpreted and applied *Lovasco* and its progeny. Nearly every federal circuit has adopted some variant of the test adopted in *Wilson*.[10] The Seventh Circuit has adopted two different tests. *See Wilson v. McCaughtry*, 994 F.2d 1228, 1233 (7th Cir. 1993). Many Seventh Circuit cases have applied tests similar to that in *State v. Wilson*, by requiring the defendant to show that the prosecution delayed for either a "tactical advantage"[11] or "impermissible purpose."[12] In other cases, the Seventh Circuit has applied a test that balances prejudice to the defendant against the government's reason for the delay, but even this test still looks at the *government's* purpose for the delay.[13]

---

[10] *United States v. Crouch*, 84 F.3d 1497, 1523 (5th Cir. 1996); *United States v. Hayes*, 40 F.3d 362, 367 (11th Cir. 1994); *United States v. Engstrom*, 965 F.2d 836, 839 (10th Cir. 1992); *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992); *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987) ("no showing of an improper prosecutorial motive"); *United States v. Sebetich*, 776 F.2d 412, 430 (3d Cir. 1985); *United States v. Crooks*, 766 F.2d 7, 11 (1st Cir. 1985); *United States v. Bartlett*, 794 F.2d 1285, 1293 (8th Cir. 1986) (in dicta). Only the Fourth Circuit and the Ninth Circuit have adopted different tests. *See United States v. De Jesus Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007) (weighing length of delay against reasons for delay); *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990) (balancing prejudice against "government's justification for delay").

[11] *See, e.g., United States v. Wallace*, 326 F.3d 881, 886 (7th Cir. 2003) (quoting *United States v. Dickerson*, 975 F.2d 1245, 1252 (7th Cir. 1992)).

[12] *See, e.g., United States v. Wellman*, 830 F.2d 1453, 1460 (7th Cir. 1987).

[13] *See United States v. Doerr*, 886 F.2d 944, 964 (7th Cir. 1989) (weighing "actual prejudice . . . against the government's reasons for the delay"); *see also United States v. Perry*, 815 F.2d 1100, 1103 (7th Cir. 1987).

Acknowledging the split but declining to resolve it, the Seventh Circuit has noted that "were we required to choose between the two tests . . . , *Gouveia* would be powerful support for adopting a requirement that defendants show actual prejudice caused by a purposeful, tactical delay by the prosecution." *McCaughtry,* 994 F.2d at 1233 n. 5.

¶ 53. Because McGuire has failed to identify any improper motive or purpose on the part of the State, we need not address whether McGuire was prejudiced by the delay. In any event, McGuire has failed to meet the requisite showing of prejudice. "The death of a witness alone is not sufficient to establish prejudice." *United States v. Eckhardt,* 843 F.2d 989, 995 (7th Cir. 1988). The defendant must explain the substance and relevance of the witness's testimony; the showing must be concrete, not speculative. *Id.* (citing *United States v. Antonino,* 830 F.2d 798, 804–05 (7th Cir. 1987)).

¶ 54. McGuire identifies a number of deceased witnesses that he claims would have corroborated his defense and rebutted Sean's and Victor's testimony. These witnesses include other priests living in the Loyola Academy residences; McGuire's secretary, John Gooch; Victor's uncle and owner of the Fontana cottage, Harry B.; and various relatives of Victor and Sean. McGuire asserts that the priests would testify that Sean and Victor could not have lived with McGuire undetected, Gooch would testify that McGuire was not involved with Victor and Sean, and Harry would testify that he did not give McGuire a key to the cottage. However, McGuire offers no support for these assertions. Simply identifying deceased witnesses and describing testimony that they *might* have provided does not satisfy the requisite showing of actual prejudice.

¶ 55. McGuire also argues that Loyola Academy records, including use of fleet vehicles and the reasons for Jesuits' absences from school, would constitute exculpatory evidence. Again, McGuire merely speculates that these documents would rebut Sean and Victor's testimony, but he fails to demonstrate that those documents would actually provide the evidence he claims.

¶ 56. In sum, the charges against McGuire were not barred by due process because he has failed to allege an improper prosecutorial motive. Furthermore, while he has identified potential witnesses and evidence that might have been relevant to issues at trial, his assertions about what that testimony would prove are speculative. Consequently, he has failed to demonstrate the actual prejudice required to prove a due process violation.

C. Reversal in the Interest of Justice

¶ 57. McGuire next argues that reversal is warranted in the interest of justice under Wis. Stat. § 751.06. He claims that the delay in bringing charges "so undermined" his ability to defend himself that the real controversy was not fully tried.

¶ 58. Wisconsin Stat. § 751.06 describes this court's power of discretionary reversal:

> [I]f it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from . . . and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial . . . .

*Id.*

313

¶ 59. We will exercise our discretionary power of reversal "only in exceptional cases." *State v. Hicks,* 202 Wis. 2d 150, 161, 549 N.W.2d 435 (1996). In doing so, we look at the "totality of circumstances and determine whether a new trial is required to accomplish the ends of justice." *Id.* (quoting *State v. Wyss,* 124 Wis. 2d 681, 735–36, 370 N.W.2d 745 (1985)).

¶ 60. McGuire argues that, because of the delay, a new trial is an insufficient remedy, and asks for outright dismissal of the charges. We conclude that discretionary reversal is inappropriate on these facts.

¶ 61. In support of his argument that the real controversy was not fully tried, McGuire points to the same deceased witnesses and missing evidence that he cites to support his claim that the charges were barred by due process. As we articulated earlier, his assertions regarding unavailable evidence were too speculative to constitute actual prejudice; for the same reason, we conclude that the real controversy was fully tried and justice has not miscarried.

¶ 62. McGuire cites *State v. Cuyler,* asserting that it is analogous to the facts of this case because credibility was a central issue in both cases. *State v. Cuyler,* 110 Wis. 2d 133, 141–42, 327 N.W.2d 662 (1983). In *Cuyler,* this court reversed for a new trial because the circuit court excluded evidence that was admissible and material to the "critical issue of credibility," which was "a determinative issue" in the case. *Id.* at 141. *Cuyler* does not, however, support the use of our discretionary reversal power in this case. The evidence at issue in *Cuyler* was the testimony of police officers who would

have testified as to the defendant's truthfulness. *Id.* We have no analogous situation in this case. Unlike the court in *Cuyler,* we simply have no idea what most of the unavailable witnesses would have said or how their testimony might have affected the relevant issues.

¶ 63. Additionally, while the unavailable evidence might have been relevant to the major issues at trial— Victor and Sean's claims about going to Fontana, the events of Sean's meeting with Father Schlax, and the credibility of Sean and Victor's claims that they lived in McGuire's room—those issues were fully tried by available evidence. Father Schlax was available to testify, and the defense put Father Renke's notes of the meeting with Sean into evidence, which were used to impeach Sean's testimony regarding the events of the meeting. Similarly, the defense presented evidence and cross-examined prosecution witnesses to rebut Sean and Victor's testimony that they had lived in McGuire's room.[14] Most important, Sean and Victor themselves were both available for trial, and were rigorously cross-examined by McGuire's trial counsel.

¶ 64. Based on the evidence presented at McGuire's trial, and without any indication of what the unavailable evidence would have demonstrated, we conclude that reversal is unwarranted because the real controversy was fully tried and justice was not miscarried.

---

[14] For example, Father James Gschwend testified that the Jesuits were expected to be at evening meals and someone would have asked a Jesuit why he was missing meals, contradicting Victor's testimony that he ate with McGuire after the other Jesuits were finished eating. McGuire's physician, Dr. Robert Ryan, testified regarding the layout of McGuire's room. Father James Arimond, who lived in the residences at Loyola from 1964 to 1967, testified that he never saw any young children in the residence in 1966 or 1967.

## D. Ineffective Assistance of Counsel

¶ 65. Finally, McGuire argues that he was deprived of effective assistance of counsel. To prove an ineffective assistance of counsel claim, a defendant must first demonstrate that counsel's performance was deficient, meaning that it "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Courts are "highly deferential" in scrutinizing counsel's performance, and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant must also show that the deficient performance prejudiced the defense. *Id.* at 692. This requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶ 66. McGuire first argues that Attorney Boyle unreasonably decided not to investigate and call Harry B.'s wife Elita, who would have testified that Harry was possessive about his keys and would not give them to just anybody. Boyle explained that because he intended to argue that Sean was never in Fontana, whether McGuire had a key was not an issue in the case and he did not want to make it an issue. Furthermore, he believed that Elita's testimony would have been directly refuted by Harry's sister Gertrude, who would have testified that McGuire had a key and could come and go at will. Finally, he believed that Elita's testimony would have been both speculation and inadmissible hearsay.

¶ 67. Boyle's decision not to investigate and call Elita was part of a reasonable trial strategy. It is unclear what her trial testimony would have added. She testi-

fied that she had "no idea" what Harry did with his keys prior to 1971, the year they were married. The offenses in this case predated the marriage. Thus, the speculative nature of her testimony confirms Boyle's reasoning that "[t]here was nothing to be gained" by presenting it.

¶ 68. McGuire also argues that Boyle's performance was deficient because he failed to investigate and call Robert Goldberg. Goldberg would have testified that he saw Victor and Sean together at dinner several times in 1972, at a residence shared by Gooch and Eugene P. At the time, Goldberg was 14 years old.

¶ 69. Boyle's decision not to call Goldberg constituted a reasonable trial strategy. First, Goldberg's testimony would have corroborated Sean's statement to police that he saw McGuire together with Goldberg on the Loyola Academy campus. Goldberg's testimony also would have raised questions about why McGuire was spending time with a 14–year-old boy who was not a student at Loyola. Furthermore, his testimony would have placed Sean and Victor together with Eugene P.—who also alleged that McGuire sexually abused him—near the time of the offenses. Finally, Goldberg would have been impeachable by prior criminal convictions. Boyle came to the reasonable conclusion that, because Goldberg's testimony corroborated Sean's testimony, it was "the most dangerous thing [he] had heard from the beginning of the case until the end of the case."

¶ 70. McGuire argues that, even if Boyle did not call Goldberg, he could not have reasonably made that decision without investigating Goldberg. Counsel need not investigate every potential witness, but he "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investiga-

tions unnecessary." *State v. Thiel,* 2003 WI 111, ¶ 40, 264 Wis. 2d 571, 665 N.W.2d 305 (quoting *Strickland,* 466 U.S. at 691). The inherent danger in Goldberg's testimony outweighed any potential benefit it might have had to the defense. Boyle made a reasonable decision that rendered further investigation of Goldberg unnecessary.

¶ 71. Because we conclude that Boyle's representation was not deficient, we need not address whether McGuire was prejudiced by counsel's representation.

## IV. CONCLUSION

¶ 72. In sum, Wis. Stat. § 939.74(3) is constitutional as applied to the facts of this case. It does not violate the Privileges and Immunities, Due Process, or Equal Protection provisions of the United States Constitution. Section 939.74(3) does not burden a fundamental right, and it is rationally related to the legitimate governmental interests of detecting crimes and apprehending criminals.

¶ 73. We also conclude that the delay in filing charges did not deprive McGuire of his due process rights. Because McGuire concedes that he cannot demonstrate an improper motive or purpose on the part of the state, he has failed to allege a necessary prerequisite for dismissal based on pre-indictment delay.

¶ 74. We are also satisfied that the real controversy was tried and justice has not miscarried for any reason. Therefore, reversal in the interest of justice is unwarranted.

¶ 75. Finally, we conclude that McGuire was not denied effective assistance of counsel. Trial counsel pursued a reasonable trial strategy in deciding not to investigate or call either Elita or Goldberg.

¶ 76. For the foregoing reasons, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.