COURT OF APPEALS
DECISION
DATED AND FILED

December 17, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP2270-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2017CF69

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JEFFREY DONALD LUNDELL,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for St. Croix County:  SCOTT R. NEEDHAM, Judge.  *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. Jeffrey Donald Lundell appeals a judgment of conviction for one count of possession of methamphetamine and an order denying

his motion for postconviction relief. Lundell argues that he is entitled to a new trial because one of the State's witnesses provided false testimony at his jury trial, which violated his right to due process. Alternatively, he seeks a new trial in the interest of justice. We reject Lundell's arguments and affirm.

## BACKGROUND

¶2 The State charged Lundell with one count of possession of methamphetamine. According to the criminal complaint, a sheriff's deputy came upon a disabled vehicle on the side of a highway. The deputy knew the vehicle's owner, Rachel Peyer, from prior contacts and believed that she had a valid warrant for her arrest. The deputy approached the vehicle and made contact with Lundell, who was seated in the front passenger seat. The deputy also recognized Lundell from prior contacts and believed that Lundell had valid warrants for his arrest. After confirming that both Peyer and Lundell had active arrest warrants, the deputy placed them under arrest.

¶3 Law enforcement impounded Peyer's vehicle and subsequently searched the vehicle, after obtaining a search warrant. Inside the vehicle, an investigator located "a soft sided camera bag" containing multiple "plastic gem bags," two of which contained a "white crystal substance" that field tested positive for methamphetamine.

¶4 The case proceeded to a jury trial, where Lundell argued that the State could not meet its burden to prove that he possessed the methamphetamine that was found in the camera bag. As relevant to the possession element, the State presented the testimony of Julie Germaine, a senior DNA analyst at the Wisconsin State Crime Laboratory. Germaine testified, generally, about what DNA is and how DNA testing is used in forensic science. Germaine then explained that in

2

Lundell's case, the State Crime Laboratory swabbed the outsides of six items—five gem bags and "the top portion of a gem bag"—and then performed DNA testing on those swabs. According to Germaine, "a male STR DNA profile"[1] was detected on the swabs from Items A1 and A2,[2] and Lundell was identified as the source of that profile.

¶5 Germaine further testified that the swabs from two of the other gem bags, Items A3 and A4a, had a mixture of DNA from at least three individuals. For each of those items, the State Crime Laboratory identified a "major contributor" to the DNA mixture and determined that Lundell was "the source of that major contributing DNA profile." Peyer was excluded as a possible contributor to the DNA mixture found on Items A3 and A4a. The swabs from another gem bag, Item A5, contained a mixture of DNA from at least two individuals, including a "major male STR DNA profile … consistent with the STR DNA profile detected from" Lundell. Germaine testified that the State Crime Laboratory was unable to exclude Peyer as a possible contributor to the DNA mixture on Item A5 because there "wasn't enough genetic information to make any comparison."

¶6 The State then questioned Germaine about the concept of "secondary transfer." Germaine explained:

> [F]irst, I'll tell you primary transfer. So, I am picking up my water bottle and I'm transferring my DNA to it when I pick it up. I am touching this water bottle. I am primary transfer. If I set my water bottle here and somebody else

---

[1] Germaine explained that "most of our DNA is the same from person-to-person," but a "small percentage" of our DNA—known as STR DNA—"differs from person-to-person."

[2] Item A1 was a gem bag and Item A2 was the top part of a gem bag.

comes along and picks up that water bottle, they'll leave some of their DNA on that prior to transfer, but they may also pick up some of my DNA. That's secondary transfer, because they never touched me. They only touched the water bottle that I touched.

So, secondary transfer is the transfer of DNA through an intermediary, in this case, the water bottle.

¶7 The State then asked Germaine, "Is it possible that secondary transfer could have occurred and that would have been the result of the profiles you were getting of Jeffrey Lundell in this case?" Germaine responded:

Secondary transfer … can be complicated. Because I just said that I touched this water bottle and somebody else picks up the water bottle and they'll get some of my DNA on them. But probably not enough that I'm going to then swab their hands and detect a full profile. So, secondary transfer, there are things you have to think about. You have to think about how long was something handled. Was there friction involved. It's not as easy as just, I touch this, and then someone else touches this, and now my DNA is on them. There's different levels.

So, in the case of these profiles, these are full—A1, item A1 and A2, we said it's the same male STR single source male profile. And it's strong enough that I would not expect to detect this profile from secondary transfer of skin cells.

With respect to the remaining items, Germaine similarly testified, "I would not expect to detect a major contributor that I can assign a source to from secondary transfer of skin cells."

¶8 On cross-examination, Germaine conceded that she could not say "with any degree of medical certainty" that the DNA found on the gem bags was not the result of secondary transfer. Instead, she testified that she found the possibility of secondary transfer "to be unlikely."

4

¶9    During its closing argument, the State emphasized that Lundell "was found in the vehicle at the time of this stop," that the evidence tended to show that Lundell and Peyer were "living out of this vehicle," and that "generally, people tend to know what they're keeping in their vehicles." The State also emphasized that there were "male toiletries" in the camera bag where the methamphetamine was found—including a man's razor and "some clippers"—which suggested that Peyer was not the owner of the camera bag. The State then argued, "And the strongest piece of evidence, you know, I mean, come on, we've got DNA evidence here. We've got DNA evidence all over these bags." The State specifically cited Germaine's testimony that "given the strength of the profile she found … it was unlikely … that these profiles would be generated through secondary transfer."

¶10    The jury found Lundell guilty of the single charge of possession of methamphetamine. Lundell subsequently moved for postconviction relief. In the motion, Lundell's postconviction attorney asserted that after Lundell's conviction, she obtained "what is commonly referred to as the lab packet" from the State Crime Laboratory. According to postconviction counsel, the lab packet showed that the State Crime Laboratory "did not test to determine the source of the DNA" found on the gem bags—that is, whether the DNA came from skin cells or some other type of cell.

¶11    As a result, Lundell's postconviction motion asserted that he was entitled to a new trial because Germaine "offer[ed] false testimony when she stated that the source of the DNA was skin cells," which violated Lundell's right to due process. The motion claimed that "secondary transfer was more than possible if the source of the DNA was a source other than skin cells" and that secondary transfer was actually "likely" because the gem bags were found in a bag containing Lundell's toiletries. The motion also asserted that Lundell's trial

attorney was constitutionally ineffective "for failing to object to the [S]tate's expert stating that the source of the DNA was skin cells when trial counsel should have known that the [State Crime Laboratory] did not test to distinguish the source of the DNA." In addition, the motion claimed that Lundell "was prejudiced by trial counsel's failure to obtain the DNA discovery."

¶12 In support of his postconviction motion, Lundell submitted a report prepared by Dr. Alan Friedman, a forensic scientist, who opined:

> I do not disagree with the lab's conclusion that Jeffrey Lundell's DNA was on 5 gem bags that were DNA profiled in this case.
>
>  ….
>
> The salient question in this case is: "How did Lundell's DNA get on the bags?" DNA can be transferred to an item of evidence by direct or primary transfer. However, DNA can also be transmitted by secondary transfer where DNA is transferred from an individual to an intermediate substrate and from there to the evidence.
>
> The gem bags were found in a camera bag that contained various male toiletries. In her trial testimony … Julie Germaine stated: *"[The profile is] strong enough that I would not expect to detect this profile from secondary transfer of skin cell[s]."*
>
> Although the laboratory has the capacity to test for saliva, blood and semen, these tests were not performed in this case so that analyst should not have assumed that the source of the DNA on the bags was skin cells. By limiting her opinion to skin cells from the hand, Ms. Germaine ignored that the secondary transfer could have come from the man's razor, clipper, or other toiletries that were found along with the gem bags. Blood, tissue, or saliva could have been the source of Lundell's DNA that was transferred from the toiletry items.

¶13 The circuit court held an evidentiary hearing on Lundell's postconviction motion, at which Dr. Friedman was the only witness. Following

Dr. Friedman's testimony, the court rejected Lundell's ineffective assistance claim based on Lundell's failure to present his trial attorney's testimony. *See **State v. Machner***, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) (explaining that "where a counsel's conduct at trial is questioned, it is the duty and responsibility of subsequent counsel to go beyond mere notification and to require counsel's presence at the hearing in which his conduct is challenged").

¶14 The parties subsequently filed briefs regarding Lundell's due process claim. The circuit court later issued a written order denying Lundell's postconviction motion in its entirety. The court reasoned that "[t]he evidence set forth by Lundell does not demonstrate that Germaine testified falsely. Rather, Lundell's post-conviction expert, Dr. Friedman, disagreed with the opinions offered by Germaine. That does not make the testimony false." The court also concluded that even if the challenged testimony was false, in light of the other evidence presented at trial, it was "not reasonably likely the admission of Germaine's testimony regarding secondary DNA transfer affected the jury's verdict." The court therefore concluded that Lundell was "not entitled to a new trial on due process grounds." In addition, despite the absence of trial counsel's testimony at the postconviction hearing, the court concluded that Lundell could not prevail on his ineffective assistance claim because he had failed to show either deficient performance or prejudice. Lundell now appeals, arguing that the court erred by denying his postconviction motion.

## DISCUSSION

¶15 On appeal, Lundell renews his argument that the State violated his right to due process by presenting false testimony at his jury trial. In the alternative, Lundell seeks a new trial in the interest of justice. Lundell does not

renew his claim that his trial attorney was constitutionally ineffective by failing to object to the allegedly false testimony.

¶16    The State argues that because Lundell's trial attorney did not object to the testimony that Lundell now claims is false, "the only way [Lundell] can challenge that testimony is through the rubric of ineffective assistance of counsel." Because Lundell has abandoned his ineffective assistance claim on appeal, the State asserts that his "challenge to [the allegedly false] testimony must be rejected."

¶17    The "normal procedure" in criminal cases is to address issues that have been forfeited by trial counsel's failure to object "within the rubric of the ineffective assistance of counsel." *State v. Erickson*, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999). The forfeiture rule, however, is a rule of judicial administration, not jurisdiction. *LaBeree v. LIRC*, 2010 WI App 148, ¶33, 330 Wis. 2d 101, 793 N.W.2d 77; *see also Erickson*, 227 Wis. 2d at 766. Here, given that Lundell's postconviction/appellate attorney failed to present trial counsel's testimony at the postconviction evidentiary hearing and subsequently abandoned Lundell's ineffective assistance of trial counsel claim on appeal, we choose to address the merits of Lundell's due process claim. We do so in the interest of judicial efficiency, to forestall a future claim for ineffective assistance of postconviction/appellate counsel based on postconviction/appellate counsel's failure to preserve Lundell's ineffective assistance of trial counsel claim.

## I.  False testimony

¶18    "Due process prevents a prosecutor from relying on testimony the district attorney knows to be false, or later learns to be false." *State v. Nerison*, 136 Wis. 2d 37, 54, 401 N.W.2d 1 (1987). Accordingly, "[d]ue process requires a

new trial if the prosecutor in fact used false testimony which, in any reasonable likelihood, could have affected the judgment of the jury." **Id.** "Whether a defendant's right to due process was violated … presents a question of law that we review de novo." **State v. McGuire**, 2010 WI 91, ¶26, 328 Wis. 2d 289, 786 N.W.2d 227.

¶19 Lundell's due process claim fails for two reasons. First, Lundell has failed to show that Germaine provided false testimony during his jury trial. Lundell asserts that Germaine's testimony regarding secondary transfer of DNA was false because she "falsely testif[ied] that the source of the DNA found on the gem bags was skin cells, making secondary transfer not something that she would expect." Germaine never expressly testified, however, that the DNA found on the gem bags came from skin cells. She did not testify that the State Crime Laboratory had determined that the DNA came from skin cells or had determined that the DNA did not come from other sources, such as blood or saliva.[3] As such, Germaine's testimony regarding secondary transfer was, at most, incomplete. While Germaine apparently assumed that the DNA on the gem bags came from skin cells, Lundell points to no evidence showing that her assumption in that regard was actually false.

¶20 Furthermore, while Lundell relied on Dr. Friedman's report and testimony to support his due process claim, Dr. Friedman never opined that Germaine's testimony was false. Instead, Friedman criticized the State Crime Laboratory's failure to determine the source of the DNA on the gem bags and

---

[3] Lundell does not dispute that the DNA found on the gem bags could have come from skin cells. Rather, he argues that the State Crime Laboratory never performed any test to determine the types of cells that were the source of the DNA.

opined that Germaine should not have "limit[ed] her opinion to skin cells from the hand" because "[b]lood, tissue, or saliva could have been the source" of the DNA.

¶21 Second, in addition to failing to show that Germaine provided false testimony at trial, Lundell has not shown a reasonable likelihood that the testimony in question could have affected the jury's judgment. *See Nerison*, 136 Wis. 2d at 54. Even if the jury had been informed that the DNA on the gem bags could have come from blood, saliva, or tissue, rather than skin cells, it is not reasonably likely that the jury would have reached a different verdict.

¶22 At trial, evidence was introduced that the camera bag in which the gem bags were found was located in the back seat of Peyer's vehicle. The jury heard that Lundell and Peyer were living out of the vehicle and that Lundell was present in the vehicle just before he and Peyer were arrested and the vehicle was impounded. The jury also heard that there were male toiletries in the camera bag. In addition, Germaine testified that Lundell was the sole source of the DNA profile on Items A1 and A2 from the camera bag and was a "major contributor" to the DNA mixture on Items A3, A4a, and A5. Germaine further testified that the DNA analysis excluded Peyer as a possible contributor to the DNA mixtures on Items A3 and A4a.

¶23 All of this evidence strongly supported a conclusion that Lundell was the owner of the camera bag and possessed the gem bags found inside it, even if the DNA found on the gem bags was transferred to the gem bags from toiletry items in the camera bag, rather than directly from Lundell's skin. Stated differently, if Lundell's DNA was, in fact, transferred to the gem bags by secondary transfer from Lundell's toiletry items, that fact would be consistent

with—and, indeed, would support—a conclusion that Lundell possessed the gem bags.[4]

¶24 In summary, Lundell has failed to show either that Germaine provided false testimony at his jury trial or that there is a reasonable likelihood that the allegedly false testimony could have affected the jury's verdict. We therefore reject Lundell's due process claim.[5]

## II. New trial in the interest of justice

¶25 In the alternative, Lundell asks us to grant him a new trial in the interest of justice. We may grant a new trial in the interest of justice "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." WIS. STAT. § 752.35 (2021-22). However, our discretionary reversal power is reserved for exceptional

---

[4] Notably, at the hearing on his postconviction motion, Lundell's postconviction/appellate attorney conceded that the camera bag in which the gem bags were found belonged to Lundell. However, counsel argued that Peyer could have possessed the camera bag because she was the registered owner and driver of the vehicle where the camera bag was found. Given the evidence summarized above, we perceive no reasonable likelihood that the jury would have had a reasonable doubt about Lundell's possession of the camera bag absent Germaine's testimony regarding secondary transfer of DNA. Furthermore, we observe that the jury was expressly instructed that possession may "be shared with another person. If a person exercises control over a substance, the substance is in that person's possession, even though another person may also have similar control." *See* WIS JI—CRIMINAL 6030 (2024).

[5] On appeal, Lundell argues that the DNA found on the gem bags "may have been transferred from one gem bag to another, because [an] officer packaged all of the gem bags in one brown paper bag for transport to the [State Crime Laboratory]." Lundell also asserts that there was "a greater opportunity for secondary transfer between the gem bags" because "the drug analyst with the [State Crime Laboratory] handled all of the gem bags for purposes of weighing and testing the chemical composition of the substance in the gem bags before the gem bags were sent for DNA testing." While these arguments may have supported a determination by the jury that Lundell did not possess the gem bags, they do not show that Germaine's testimony regarding secondary transfer was false.

cases, *State v. McKellips*, 2016 WI 51, ¶52, 369 Wis. 2d 437, 881 N.W.2d 258, and "should be exercised sparingly and with great caution," *State v. Williams*, 2006 WI App 212, ¶36, 296 Wis. 2d 834, 723 N.W.2d 719.

¶26 Here, Lundell argues that he is entitled to a new trial in the interest of justice because the real controversy was not fully tried. Situations where the real controversy was not fully tried include those where the jury "was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case" or "had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried." *State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996). "To order a new trial because the real controversy has not been fully tried, this court need not determine that a new trial would likely yield a different result." *State v. Watkins*, 2002 WI 101, ¶97, 255 Wis. 2d 265, 647 N.W.2d 244.

¶27 Lundell argues that the real controversy was not fully tried because "[t]he [j]ury was erroneously not given the opportunity to hear testimony that the source of [his] DNA was never tested by the [State Crime Laboratory]." Without that evidence, Lundell asserts that the jury "was left to believe, based on [Germaine's] testimony[,] that the source of the DNA was skin cells and not likely on the result of secondary transfer." Lundell therefore contends that the jury "was led to believe [Lundell] had to have touched the gem bags." According to Lundell, "[w]ithout any other direct evidence to prove possession, this was not just an important issue, but the most important issue at trial."

¶28 We are not convinced that this is the type of exceptional case warranting the use of our discretionary reversal power. *See McKellips*, 369 Wis. 2d 437, ¶52. As discussed above, Lundell has not identified any portion of

Germaine's testimony that was actually false. Furthermore, while Lundell asserts that the jury "was led to believe [he] had to have touched the gem bags," Lundell's trial attorney expressly argued that Lundell's DNA could have been transferred to the gem bags because the officer who searched the vehicle could not remember whether he changed gloves between handling the different pieces of evidence found in the vehicle. Counsel emphasized that there was a "mountain of stuff" in the vehicle that may have contained Lundell's DNA, and "[if] [those items] got touched and then [the officers] touched these baggies … the DNA got transferred."

¶29 Lundell's trial attorney also emphasized that Germaine had merely testified that secondary transfer was "unlikely," not impossible. Counsel argued that "probably not" was insufficient to prove Lundell's guilt beyond a reasonable doubt.

¶30 Thus, despite the lack of evidence at trial about the source of the DNA found on the gem bags, contrary to Lundell's assertion, the evidence did not necessarily compel a conclusion that Lundell "had to have touched the gem bags." Lundell has failed to show that the real controversy was not fully tried, and we therefore decline to grant him a new trial in the interest of justice.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2021-22).