STATE of Wisconsin, Plaintiff-Respondent,†

v.

Kenneth M. DAVIS, Defendant-Appellant.

Court of Appeals

*No. 2010AP1856. Oral argument June 23, 2011.*
*—Decided October 25, 2011.*

2011 WI App 147

(Also reported in 808 N.W.2d 130.)

† Petition for Review filed 11-17-11.

688

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert R. Henak* of *Henak Law Office* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Thomas J. Balistreri*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. KESSLER, J. Kenneth M. Davis appeals an order of the trial court denying his motion for postconviction relief. Davis contends that he is entitled to a new trial because: (1) his trial counsel was ineffective for failing to seek suppression of statements attributed to Davis but taken in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981); (2) his first postconviction counsel was ineffective for failing to raise the *Edwards* issue in Davis's initial postconviction motion and for failing to reasonably argue newly discovered evidence that a co-actor admitted that Davis was not involved in the incident at issue; and (3) newly discovered evidence exists that Davis's cellmate, who testified at trial, admitted to another inmate that he planned to use information against Davis in an attempt to get himself transferred to a lower security prison.[1]

¶ 2. We reverse the trial court and remand for a new trial using our discretionary reversal power because: (1) testimony regarding possible false accusations against Davis calls into question whether Davis actually participated in the crime for which he was

---

[1] The parties appeared for oral argument on June 23, 2011.

convicted; (2) the jury that convicted Davis did not hear this testimony; and (3) this testimony, combined with evidence that was erroneously admitted, undermines our confidence in the outcome of Davis's trial. Therefore, we conclude that the real controversy of whether Davis actually participated in the robbery and murder was not fully tried.

## BACKGROUND

¶ 3. On June 29, 2001, Davis was convicted of felony murder relating to the armed robbery and shooting death of Henry Matthews. Davis was sentenced to eighty years with sixty years of initial confinement and twenty years of extended supervision.

¶ 4. On June 20, 2000, three men robbed what they thought was a drug house in an attempt to obtain marijuana. The three men first confronted Matthews on the porch and two subsequently entered the house while the third remained on the porch. When one of the occupants of the house awoke to see one of the robbers pointing a gun at him, the occupant attempted to grab the gun and shooting ensued. All three robbers participated in the shoot-out, resulting in Matthews's death.

¶ 5. In December 2000, Davis and Armond Henderson were charged with felony murder relating to the armed robbery and death of Matthews. The third robber, identified as Roger Powell, was also arrested and charged. Davis went to trial in June 2001.

¶ 6. During the trial, the State relied heavily on the testimony of three main witnesses to prove that Davis was one of the robbers. The first was Henderson, who pursuant to a plea agreement, testified that Davis, nicknamed "Blue," and Powell were his co-actors in the robbery and shooting.

¶ 7. The State also relied on the testimony of Detective Christopher Domagalski. Detective Domagalski interviewed Davis while Davis was in custody. Detective Domagalski testified that Davis waived his *Miranda*[2] rights and stated that Davis admitted to being "present" at the "dope house," "fe[lt] guilty" about what happened to Matthews, and requested to speak "hypothetically" or "off the record" about the details of the robbery and shooting. When Detective Domagalski informed Davis that they could not speak off the record, Davis asked for an attorney. Detective Domagaski also testified that his partner wrote down a summary of Davis's interview, read it to Davis, and asked Davis whether he wished to change anything and whether the statement was accurate—all after Davis's request for counsel. Detective Domagalski told the jury that Davis verified the accuracy of the statement, but refused to sign it.

¶ 8. The State also called Richard Ringstad, a former cellmate of Davis's, who testified that Davis confessed his involvement in the robbery while the two were housed in a cell together. A jury convicted Davis of felony murder after a week-long trial.

¶ 9. Following Davis's sentencing, his postconviction counsel filed a motion alleging new evidence that (1) Ringstad was schizophrenic and suffered from delusions and hallucinations and (2) Henderson admitted to others that Davis was not involved in the robbery and murder of Matthews. The postconviction court denied the motion and we upheld the denial.

¶ 10. On June 1, 2009, through new postconviction counsel, Davis filed a postconviction motion pursuant to Wis. Stat. § 974.06 (2009–10) alleging:

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

(1) ineffective assistance of trial counsel for counsel's failure to object to the admission of evidence that Davis allegedly confirmed a police account of the incident—in which Davis admits involvement—because Davis's confirmation was obtained after he invoked his right to counsel; (2) ineffective assistance of Davis's first post-conviction counsel for failure to raise trial counsel's errors in Davis's postconviction motion, and for failure to adequately argue the newly discovered evidence issues; and (3) newly discovered evidence.

¶ 11. Among the various witnesses who testified during the three days of postconviction evidentiary hearings were Derrick Griffin, Cornelius Reed and Daniel Winkler. Both Griffin and Reed testified that Henderson admitted to them that Davis was not actually with Henderson and Powell at the drug house the day of the incident. Winkler testified that Ringstad admitted to going through Davis's locker while they were at the Columbia Correctional Institution and planned to use information found in the locker to attempt to get transferred to a lower security prison.

¶ 12. The trial court agreed with Davis that testimony pertaining to Davis's confirmation of the written police statement was wrongfully admitted at trial pursuant to *Edwards*, but found that the error was harmless because police testimony pertaining to Davis's actual confession, made prior to his request for counsel, was admissible. The trial court orally denied Davis's motion.

¶ 13. Davis now appeals, arguing that he is entitled to a new trial because: (1) his trial counsel was ineffective for failing to seek the suppression of statements attributed to Davis but taken in violation of *Edwards*; (2) his first postconviction counsel was ineffective for failing to raise the *Edwards* issue in Davis's

693

initial postconviction motion and for failing to reasonably argue newly discovered evidence; and (3) newly discovered evidence exists that Ringstad admitted to another inmate that he planned to use information against Davis in an attempt to get himself transferred to a lower security prison.[3]

¶ 14. Additional facts are provided as relevant to the discussion.

## DISCUSSION

¶ 15. Davis raises multiple arguments as to why he is entitled to a new trial. Because we conclude that he is entitled to a new trial in the interest of justice because the real controversy of Davis's identity as the third robber has not been fully tried, we need not address those arguments. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (this court need not address other issues when one is dispositive). We discuss how the testimony of Griffin, Reed and Winkler, along with the erroneously admitted testimony of Detective Domagalski, combine to undermine our confidence in the outcome of Davis's trial.

### I. *Standard of Review.*

¶ 16. We possess a broad power of discretionary reversal pursuant to Wis. Stat. § 752.35 (2009–10),

---

[3] Davis's brief raises other issues in addition to the ones we have summarized. Because we reverse in the interest of justice, we need not address those arguments. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶ 8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (we decide cases on the narrowest possible grounds).

which provides authority to achieve justice in individual cases. *See Vollmer v. Luety*, 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990). We may exercise our power of discretionary reversal where it appears from the record that the real controversy has not been fully tried, or if it is probable that justice has for any reason miscarried. *See* § 752.35.[4] We also "may exercise [our] power of discretionary reversal under the first part of Wis. Stat. § 751.06, without finding the probability of a different result on retrial [if we conclude] that the real controversy has not been fully tried." *See State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996). " '[T]he real controversy has not been tried if the jury was not given the opportunity to hear and examine evidence that bears on a significant issue in the case, even if this occurred because the evidence or testimony did not exist at the time of trial.' " *State v. Maloney*, 2006 WI 15, ¶ 14 n.4, 288 Wis. 2d 551, 709 N.W.2d 436 (citation omitted). The only factor under § 752.35 applicable here is whether the real controversy, which is whether Davis's alleged involvement in the robbery of the drug house and the murder of Matthews, was fully tried. This requires us to determine whether, considering the totality of circumstances, a new trial is required to accomplish the ends of justice. *See State v. Wyss*, 124 Wis. 2d 681, 735–36, 370 N.W.2d 745 (1985).

---

[4] The second basis for reversal is that it is probable that "justice has for any reason miscarried." *See* Wis. Stat. § 752.35. This requires that we conclude that a different outcome would result. *See State v. Wyss*, 124 Wis. 2d 681, 735, 370 N.W.2d 745 (1985); *See also Lock v. State*, 31 Wis. 2d 110, 118, 142 N.W.2d 183 (1966). ("In order for this court to exercise its discretion and for such a probability to exist we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial."). We are not relying on this § 752.35 factor and do not discuss it further.

¶ 17. The State built its case against Davis primarily based upon: (1) Henderson's testimony that Davis was the third robber; (2) Detective Domagalski's testimony that Davis indicated that he was "present" at the "dope house" and "fe[lt] guilty" about Matthews's death; (3) Davis's confirmation of those statements after asking for a lawyer; and (4) Ringstad's testimony that Davis confessed to the armed robbery and shooting death of Matthews. The State's theory was that Henderson and Ringstad's testimony served as proof of Davis's guilt. That inference is inconsistent with the later statements made by Griffin, Reed and Winkler. We agree with the State that police testimony about Davis's admission in and of itself was not subject to suppression because it was made before Davis invoked his right to counsel. However, Davis's confirmation of his statements after he requested counsel was admitted in violation of *Edwards*. *See id.*, 451 U.S. at 485–86. Although this admission was harmless error in the context of the case as tried, it is not harmless error in light of Griffin's, Reed's and Winkler's testimony at the postconviction hearing. The crucial issue of whether Davis was actually involved in the robbery and the murder of Matthews was not fully tried because the jury did not have the opportunity to hear that testimony and to weigh that testimony against Davis's admission, without the emphasis of Davis's statement by adding the improper confirmation by Davis after he invoked his right to counsel.

## II. Testimony from the postconviction hearing.

### A. Henderson to Griffin

¶ 18. Although most of the State's arguments pertaining to Griffin, Reed and Winkler's testimony are

in response to Davis's contention that the testimony constitutes newly discovered evidence—an argument we do not reach—the State contends that such testimony simply impeaches Henderson and is insufficient to warrant a new trial.[5] We disagree.

¶ 19. The State relied heavily on Henderson's testimony at trial. Much of the State's closing argument was centered on what the State referred to as Henderson's "truthful and credible" assertion that Davis was the third robber. Specifically, the State argued:

> So why should you believe that statement of Mr. Henderson? Because Mr. Henderson said that he committed a murder. He said that he committed this murder; this armed robbery along with two other named individuals. And frankly, it stands to reason that if you're going to be telling the truth about your own involvement, that you're going to be telling the truth about the other people's involvement. And does it make any sense that you're going to give a statement so far against your own interest and then lie about who your co-actor was to police?
>
> . . . .

[5] Most of the State's arguments center around its contention that Davis failed to meet the newly discovered evidence standards. The State argues specifically that Davis has not met his burden of proving that the statements made by Griffin and Winkler were discovered after his conviction. Neither Griffin nor Winkler could affirmatively testify as to whether they spoke with Davis before or after Davis's conviction. Because we are reversing based on the interest of justice, it is unnecessary for us to decide whether Davis met the standards for newly discovered evidence. However, we do note that it would be extraordinarily self-destructive and unlikely if these conversations took place before Davis's trial, for Davis not to alert his attorney about them, as the State suggests.

Now, Mr. Henderson made statements to the defense investigator . . . that it was Shomar Lord, not the defendant who was involved in the murder. No[w], he was placed in the same pod with the defendant . . . he felt threatened by this person . . . Mr. Davis started making comments about doing harm to Mr. Powell because he thought Mr. Powell might break.

. . . .

So why would Mr. Henderson come to court and say [Davis was one of the robbers] if that is not true? Well, it can't go for those concessions. First of all, the concessions, which were granted for his plea by the State in return for his testimony, were granted in return for his truthful testimony. If those statements aren't truthful, he loses those concessions. Or he may at least lose those concessions.

. . . .

The law that you need to look at says you need to look carefully at the testimony of the co-actors.

¶ 20. At the postconviction hearing, Griffin testified that at some point before October 2000 Henderson asked if he could "[hide] out" with Griffin for a few days until he could leave town because of a robbery that "went bad." Griffin stated that Henderson said "it was [Henderson], Manny [Powell] and Shomar [Lord]," who committed the robbery and that Henderson never mentioned Davis. Griffin further testified that he spoke with Davis in the winter of 2000 at the county jail, after Davis's arrest, but did not realize at that time that Davis had been arrested for the same incident described by Henderson until after Henderson's arrest in March 2001. However, Griffin also testified that when he spoke with Davis at the county jail Griffin told Davis "[Henderson] never said that you were involved," thereby

contradicting his testimony that he did not know why Davis was arrested. The State contends that Griffin's testimony is "conflicting and confused." It is up to a jury to determine how much weight and credibility to give to Griffin's testimony. *See State v. Nelson*, 2006 WI App 124, ¶ 52, 294 Wis. 2d 578, 718 N.W.2d 168. We cannot say that the State's reliance on Henderson's testimony did not effect the jury's decision to convict Davis. Griffin's testimony about Henderson's admission directly contradicts Henderson's testimony at trial. This, combined with the other statements that call into question Davis's involvement in the robbery and murder of Matthews, convince us that the real controversy of Davis's involvement has not been fully tried.

### B. Henderson to Reed

¶ 21. Reed also testified at the postconviction hearing as to statements Henderson made to him regarding the robbery and shooting at issue. Reed testified that while playing basketball with Henderson at the Waupun Correctional Institution at some point in 2002, Henderson asked Reed if Reed knew of any case law because Henderson intended to file an appeal.[6] Henderson explained that he was in jail for a shooting and told Reed that two other men, Roger "Manny" Powell and "Little Gee" were with him. Reed testified that he did not know Davis at that time, but that he later met Davis through a custodial training program at the Waupun facility and felt "obligated" to tell Davis

---

[6] Reed testified that he thought the conversation was in the summer of 2003 and that he remembered the conversation occurring during the summer, however Reed spoke with Davis's investigator about his conversation with Henderson in November 2002.

about his conversation with Henderson because Reed had once been wrongly convicted.

¶ 22. The State contends that Reed's testimony serves as impeachment testimony and is insufficient to show that the result of Davis's trial would have been different because of the testimony.

¶ 23. At the postconviction hearing, Reed testified as follows:

[Postconviction counsel]: ... Did Mr. Henderson ever suggest someone named Kenneth Davis or Blue was involved in that homicide/robbery?

[Reed]: No, sir.

[Postconviction counsel]: And did Mr. Henderson indicate whether [the Matthews robbery] was the robbery that he was convicted of or whether that was simply another robbery he was involved with?

[Reed]: He had stated to me that was the robbery he was convicted of that he was doing time for.

[Postconviction counsel]: Was there any discussion with Mr. Henderson about Kenneth Davis?

[Reed]: Yeah, he came up.

[Postconviction counsel]: How did he come up?

[Reed]: He came up because [Henderson] stated that the other guy that they alleged was charged with that was in the institution with us. So that's how [Davis] came up.

. . . .

[Postconviction counsel]: Okay. So Henderson told you that Davis, that the third person convicted in that case also was at Waupun Correctional?

700

[Reed]: Yes, sir.

[Postconviction counsel]: Okay. Did [Henderson] say anything about the accuracy of Davis, Davis's conviction?

[Reed]: No, he just stated that he was, that he was one of the guys they had for it, and I asked him why, if he was one of the guys they had for it, why didn't he come forward and tell that the guy had nothing to do with it, and [Henderson] was like, man, [Henderson] ain't going to dig himself in a bigger ditch so he didn't say nothing.

. . . .

[Postconviction counsel]: Did Henderson ever explain to you what, if any, role Henderson had in Davis'[s] trial?

[Reed]: Yes, he told me that he was willing to testify on Davis, yes.

[Postconviction counsel]: Okay. That was even though Davis was not in fact involved in it?

[Reed]: Yes, sir.

[Postconviction counsel]: Did Henderson say anything to you one way or the other about whether he had a—whether he was benefited by providing information to the prosecutor?

. . . .

[Reed]: He stated that if he, if he would have testified, testified against Mr. Davis, that he would get lesser time.

[Postconviction counsel]: Okay. Did he tell you oneway or the other what effect it would have if he had told the truth?

[Reed]: Not—The only thing that he stated about that was that he'd probably would have gotten more time if he had told the truth about who it was.

¶ 24. Reed's testimony directly contradicts Henderson's trial testimony. Henderson's statements to Reed do not merely serve as impeachment evidence, but rather as affirmative evidence of Davis's innocence. *See Vogel v. State*, 96 Wis. 2d 372, 383–84, 291 N.W.2d 838 (1980) (a prior inconsistent statement can be admitted for its truth, not merely just for impeachment purposes). In its closing arguments, the State heavily emphasized Henderson's testimony that Davis was the third robber. We cannot conclude that the State's argument and the trial testimony to which it referred had no effect on the jury verdict.

### C. *Ringstad to Winkler*

¶ 25. The jury also did not hear the testimony of Dan Winkler. Winkler testified at the postconviction hearing that between April and June 2001 both Winkler and Ringstad participated in a janitorial training program at the Columbia Correctional Institution. Winkler testified that at some point during this time, Ringstad asked Winkler "if [Winkler] had information on somebody in the penitentiary, would [Winkler] use it against them to get to a lower facility like a medium/minimum security facility."

¶ 26. Winkler further testified:

[Winkler]: [Ringstad] kept talking to me about it. I told him, no, I would not use something like that against another individual, and–and he–he basically said something like–he explained the guy, the race of

the guy, and he basically said it would just be another n-i-g-g-a up the river, down the river or something to that effect.

. . . .

[Postconviction counsel]: ... Did you ever have another conversation with Mr. Ringstad concerning this topic?

[Winkler]: Yes.

[Postconviction counsel]: And what was the nature of that conversation?

[Winkler]: [Ringstad] had said that he went into his cellmate's footlocker because he had not had a lock on his locker when he came in to the penitentiary and that he went through some of his files and he told me a little bit about what this guy was accused of and, you know, whatnot, and he said that–he said that he would possibly use that information to get to a medium or minimum facility. He asked me if I thought it was possible and I told him they'll probably send you out the next day or put you in protective custody if you went forward with it with what he was planning.

. . . .

[Postconviction counsel]: ... The best you can recall, what did [Ringstad] tell you he was planning to do?

[Winkler]: He was planning to use the information to get to a minimum/medium security prison to get out of Columbia Correctional Institution by–by using the information against the other guy.

[Postconviction counsel]: ... [D]id Ringstad say who the other guy was?

[Winkler]: He–he used the name Blue[.]

703

¶ 27. Winkler further testified that although he did not know who Davis was at the time of the conversation with Ringstad, he eventually came to know Davis's identity and told Davis about his conversation with Winkler. Winkler could not recall whether he informed Davis of this conversation before or after Davis's trial. Davis's trial counsel testified that he was unaware of Ringstad's statements to Winkler at the time of Davis's trial.

¶ 28. The State argues that Ringstad's testimony about Davis's admission had a "ring of plausibility" and that Winkler's testimony easily could have been made up. At trial, the State emphasized the relationship between Davis and Ringstad as "cell mates" by stating:

> They were in the same day room . . . They were watching TV together, maybe eating together. They were socializing together, at least within the limited conversation that allowed to them in their custodial status.
>
> What do these guys have in common; meeting in a custodial situation? . . . During the course of chatting, during the course of this contact between Mr. Ringstad and the defendant, the defendant told him a number of things of significance in this case; implicated the defendant and tells us that the defendant has knowledge of this offense. The defendant is the person with Mr. Henderson and with Mr. Powell who committed this offense . . . . He said [to Ringstad] we never would have got caught if one of my guys hadn't talked. He said that he went upstairs and, quote, popped a couple of caps, inferring to shooting[.]
>
> The witness testified that he is not a professional snitch; this is the first time he has come forward . . . He spoke with Mr. Davis; was upset by what Mr. Davis said, and felt like he had to come forward[.]

¶ 29. We cannot say that Ringstad's testimony did not effect the jury's verdict. The jury did not have an opportunity to compare Winker's testimony to Ringstad's and decide which had a greater "ring of plausibility." Winkler's testimony goes directly to the issue of Davis's presence at the robbery and participation in Matthews's murder. This testimony, combined with the testimony already described, directly contradicts Ringstad's testimony—a key element in the State's case against Davis. The jury never had an opportunity to weigh these competing versions of the critical facts in the trial.

### III. Davis's confirmation of his admission to police.

¶ 30. Davis contends that police violated *Edwards* when they asked Davis whether his statement was accurate after Davis invoked his right to counsel. Davis argues that testimony about his confirmation of the accuracy of the statement and his refusal to sign the statement should have been suppressed. *Edwards* requires that all custodial interrogation cease once a suspect unequivocally requests an attorney, unless the accused initiates further communication. *See id.*, 451 U.S. at 485–86. " '[I]nterrogation' " is not limited to "express questioning," but also refers to "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). An " 'incriminating response' " is "any response whether *inculupatory or exculpatory* that the prosecution may seek to introduce at trial." *Id.* at 301 n.5 (emphasis omitted). Evidence of Davis's confirmation of his admission and his refusal to sign the state-

ment written by police was introduced at trial by the prosecution through Detective Domagalski's testimony.

¶ 31. The trial court found that the police inquiry violated the holdings in *Edwards* and that this testimony was erroneously admitted. The trial court also found that the error was harmless.

¶ 32. Detective Domagalski testified that Davis was interviewed three times while in custody, with only the third interview resulting in Davis's admissions that he was present at the robbery and felt guilty about Matthews's death. When police declined Davis's request to speak "off the record" or "hypothetically," Davis stated that he wanted to speak with an attorney. Detective Domagalski testified that he and his partner stopped questioning Davis at that point, however, his partner wrote a written summary of the interview with Davis. Police showed Davis this statement, asked him whether it was recorded accurately and whether he wished to make any changes. Detective Domagalski told the jury that Davis replied that the statement was accurate, but refused to sign it

¶ 33. Davis also testified at trial and denied agreeing with the accuracy of the written statement. Davis told the jury that he was shown the statement and asked whether he wanted to make changes, but was not permitted to write in the changes himself; rather, he was to initial the words that he felt were inaccurate. Davis stated that the words "present, involved, hypothetically [and] feel[ing] guilty" were inaccurate, but because he could only initial the inaccuracies, rather than change them, he "refused to do it" and also refused to sign the statement.

¶ 34. Regardless of whether the testimony should have been excluded because of the *Edwards* violation the trial court found, we conclude that the evidence

706

which the jury should have heard, but did not, made it impossible for the jury to weigh all appropriate factors in considering the importance of Davis's properly admitted confession.

## CONCLUSION

¶ 35. The cumulative effect of the evidence the jury did not hear, but should have, leads us to conclude that the real controversy of whether Davis participated in the robbery/murder of Matthews has not been fully tried. For all the forgoing reasons, we reverse the trial court and remand this matter for a new trial in the interest of justice pursuant to the first part of WIS. STAT. § 752.35.[7]

*By the Court.*—Order reversed and cause remanded for a new trial.

---

[7] The State, in a motion for reconsideration of our opinion in this case, argues that *State v. Allen*, 159 Wis. 2d 53, 464 N.W.2d 426 (Ct. App. 1990) (*"Allen II"*), and *State v. Henley*, 2010 WI 97, 328 Wis. 2d 544, 787 N.W.2d 350, deprive us of the authority to reverse Davis's conviction and order a new trial in the interest of justice under WIS. STAT. § 752.35 because Davis's appeal stems from an order denying a motion for postconviction relief under WIS. STAT. § 974.06 and is not a direct appeal. We disagree.

In *Allen II*, we were directed by the supreme court, in light of its holding in *Vollmer v. Luety*, 156 Wis. 2d 1, 456 N.W.2d 797 (1990), to reconsider our original decision not to review an unobjected-to jury instruction that could have been raised in the initial appeal. *See Allen II*, 159 Wis. 2d at 54–56. We maintained our earlier decision and did not reverse the trial court's decision to deny a new trial. *See id.* at 55. Without repeating the rationale of our previous opinion, we simply announced that "[o]ur power of discretionary reversal under sec. 752.35, Stats., may be exercised only in direct appeals from judgments or orders" and provided a cursory analysis of WIS.

707

¶ 36. FINE, J. (*concurring*). I agree that we should reverse in the interest of justice. In my view, however,

STAT. § 752.35. *Allen II*, 159 Wis. 2d at 55–56. We did not discuss the expansive authority of discretionary reversal explained by the supreme court in *Vollmer*.

*Vollmer* explained the scope of this court's statutory discretionary reversal power under WIS. STAT. § 752.35 and noted our primary duty of "doing justice in an individual case":

> We emphasized [in *State v. Schumacher*, 144 Wis. 2d 388, 424 N.W.2d 672 (1988)], . . . that the discretionary power of reversal, granted to both the court of appeals and [the supreme court] by statute, as opposed to the discretionary power of review granted to [the supreme court] by the common law, is compatible with doing justice in an individual case, which is primarily the duty of the court of appeals . . . . [The court of appeals] should have the substantial discretion granted under sec. 752.35, Stats., as that statute is liberally construed.

*Vollmer*, 156 Wis. 2d at 15. "Doing justice" under the authority of WIS. STAT. § 752.35 is what this court attempted to do in this decision. Our reversal of a trial court order denying a new trial is specifically permitted by § 752.35, which directs in relevant part:

> In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, . . . the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial[.]

The specific language of WIS. STAT. § 752.35 does not limit this court's power of discretionary reversal to direct appeals. Had the legislature intended such limitation, there would be no reason for giving us the authority to reverse an order. *See Hubbard v. Messer*, 2003 WI 145, ¶ 9, 267 Wis. 2d 92, 673 N.W.2d 676 (Each word of a statute "should be looked at so as not to render any portion of the statute superfluous" and "must be read in the context of the whole statute to avoid an unreasonable or absurd interpretation.").

In *Allen II*, the focus of the WIS. STAT. § 974.06 motion was an unobjected-to error in the jury instructions which could have

we do not have to, and should not, decide whether the detective's asking Kenneth Davis to confirm the accuracy of what he told the officers before invoking his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), violated the rule in *Edwards v. Arizona*, 451 U.S. 477 (1981), because Davis's confirmation of the accuracy of what he told the officers was *de minimis*—the jury would have still heard what he told the officers even if the trial court had suppressed the detective's confirmation testimony.

been raised on direct appeal, and which apparently did not result in the real controversy not having been fully tried. *See Allen II*, 159 Wis. 2d at 54. However, unlike in *Allen II*, the focus of the § 974.06 motion in this case is on testimony either not presented or not available at the time of trial or the original appeal. This *did* result in the real controversy of Davis's identity not being fully tried. The *Vollmer* court concluded: "[B]ecause secs. 751.06 and 752.35, Stats., are identical, the legislature did not intend for the court of appeals' power to reverse under sec. 752.35 to be less than that of the supreme court under sec. 751.06." *Vollmer*, 156 Wis. 2d at 17. As Justice Crooks pointed out in his dissent in *Henley*, the supreme court has found no such limitation on its own statutory discretionary reversal authority. *See id.*, 328 Wis. 2d 544, ¶ 140. The supreme court further noted that its discretionary reversal powers are "coterminous" with ours. *See State v. Armstrong*, 2005 WI 119, ¶ 113, 283 Wis. 2d 639, 700 N.W.2d 98. To the extent *Allen II* is inconsistent with *Vollmer*, the supreme court decision controls. *See Cashin v. Cashin*, 2004 WI App 92, ¶ 44, 273 Wis. 2d 754, 681 N.W.2d 255 ("When a decision of this court and the supreme court are inconsistent, we are bound by the decision of the supreme court.").