ANNETTE KINGSLAND ZIEGLER, J.
¶ 99. (dissenting). I respectfully dissent from the majority opinion. In my view, Jenkins did not receive ineffective assistance of counsel in the case at issue. Given the highly deferential standard and the presumption in favor of finding that counsel's performance was objectively reasonable, I conclude that counsel's performance *216 was neither deficient, nor was Jenkins prejudiced by counsel's alleged failures, such that there is a "reasonable probability" that the result of the proceeding would have been different. Further, I conclude that Jenkins is not entitled to a new trial in the interest of justice.[1]
I. ANALYSIS
¶ 100. "Whether a convicted defendant received ineffective assistance of counsel is a two-part inquiry." State v. Carter, 2010 WI 40, ¶ 21, 324 Wis. 2d 640, 782 N.W.2d 695 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). "First, the defendant must prove that counsel's performance was deficient. Second, if counsel's performance was deficient, the defendant must prove that the deficiency prejudiced the defense." Id. A defendant "must satisfy both prongs of the Strickland test" to succeed on a claim of ineffective assistance of counsel. Id. I conclude that neither prong is satisfied in the case at issue.
A. Deficient Performance
¶ 101. "To demonstrate deficient performance, the defendant must show that his counsel's representation 'fell below an objective standard of reasonableness' considering all the circumstances." Carter, 324 Wis. 2d 640, ¶ 22 (quoting Strickland, 466 U.S. at 688). "In evaluating the reasonableness of counsel's performance, this court must be 'highly deferential.'" Id. (quoting Strickland, 466 U.S. at 689). "Counsel enjoys a 'strong presumption' that his conduct 'falls within the *217 wide range of reasonable professional assistance.'" Id. (quoting Strickland, 466 U.S. at 689). "Indeed, counsel's performance need not be perfect, nor even very good, to be constitutionally adequate." Id. (citing State v. Thiel, 2003 WI 111, ¶ 19, 264 Wis. 2d 571, 665 N.W.2d 305).
¶ 102. This presumption of constitutional adequacy extends to decisions of trial strategy. See Carter, 324 Wis. 2d 640, ¶ 23. "Counsel's decisions in choosing a trial strategy are to be given great deference. .. . Even decisions made with less than a thorough investigation may be sustained if reasonable, given the strong presumption of effective assistance and deference to strategic decisions." State v. Balliette, 2011 WI 79, ¶ 26, 336 Wis. 2d 358, 805 N.W.2d 334 (citing Carter, 324 Wis. 2d 640, ¶ 23; Strickland, 466 U.S. at 690-91). "We must make 'every effort... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Carter, 324 Wis. 2d 640, ¶ 22 (quoting Strickland, 466 U.S. at 688).
¶ 103. In light of that deferential standard, counsel's performance in the case at issue was not deficient. The "witnesses" that counsel chose not to call, Cera Jones ("Jones"), Christopher Blunt ("Blunt"), and Corey Moore ("Moore"), were significantly compromised, would not cooperate with counsel in his preparation of the case, and in any event, would not necessarily have aided Jenkins' defense.[2] From the *218 perspective of counsel at the time of trial, we must presume that counsel concluded that these witnesses were not worth calling. In fact, presenting these witnesses might have detracted from the defense that counsel was putting forward. Thus, it is speculative to conclude as the majority does that counsel's failure to call the witnesses was deficient, as that term is defined for purposes of ineffective assistance of counsel.
¶ 104. Defense counsel's strategy at trial was simple: present evidence that Jenkins could not have been the shooter because he was across the street at a "trap" house at the time of the shooting.[3] In support of this strategy, counsel called both Jenkins and Daniel McFadden ("McFadden"), a friend who Jenkins was socializing with the night of the shooting, as witnesses. Both Jenkins and McFadden testified that Jenkins was asleep at the "trap" house when he was awoken by the shots. As the majority opinion correctly notes, the prosecution had only one witness refuting this version of events. Majority op., ¶ 18. The State called Toy Kimber, a man with five adult convictions and four juvenile adjudications, in its attempt to tie Jenkins to the shooting. Id., ¶ 21.
¶ 105. At the time counsel was developing Jenkins' defense strategy, the only statements in the record from Jones were her statements to police in the days following the shooting. According to the police reports, Jones indicated that she did not see the shooter's face because he was wearing a hood, and stated that she was not familiar with the place of the shooting or the people involved. Jones had further told police that she was not focused on the shooter, but rather, her attention was *219 drawn to the laser target on the victim standing in front of her. Further, Jones initially concealed from police that she had been involved in a drug deal just prior to the shooting, but subsequently gave several different accounts of that drug deal. Jones' inconsistent and less than exculpatory statements provide a reasonable explanation for why counsel would not have believed that Jones would assist in Jenkins' defense.
¶ 106. Given that these were the facts available to counsel at the time of trial, counsel had no reason to call Jones, as her testimony would not necessarily have bolstered Jenkins' defense.
¶ 107. The majority makes much of Jones' testimony at the Machner hearing, wherein Jones first claimed that she had also told police that Jenkins was definitely not the shooter. The circuit court, however, found that Jones' testimony in this regard was not credible. Indeed, as the trial court noted, Jones' testimony seemed to get "better and better" as time went on, something that ordinarily does not occur with eyewitnesses. The circuit court detailed why Jones would be impeached and how she was not a credible witness. The circuit court concluded, based on Jones' own statements, that Jones was herself involved in a drug deal that evening. As the circuit court concluded at the Machner hearing, "there are way too many inconsistencies with Miss Jones's statements and. . . frankly she just did not come across as a credible witness." Majority op., ¶ 31 n.9.
¶ 108. The majority opinion fails to properly defer to the circuit court's credibility determinations: "this court will not exclude the circuit court's articulated assessments of credibility and demeanor, unless they are clearly erroneous." Carter, 324 Wis. 2d 640, ¶ 19 (citing Thiel, 264 Wis. 2d 571, ¶ 23). The circuit court *220 was in the best position to evaluate the witnesses and it determined that Jones' testimony is relegated to having questionable value, at best. Under these circumstances, it is not difficult to see why counsel would not put Jones on the stand, even assuming he knew of her potentially exculpatory testimony. Not calling a drug dealing witness, who gave several inconsistent and impeachment-worthy statements to police, does not rise to the requisite level of deficient performance. Simply stated, in finding counsel to be deficient, the majority supplants the circuit court's credibility determinations with its own credibility assessments. Typically, we do not second-guess the circuit court's credibility determinations, and I would not do so in the case at issue. See Carter, 324 Wis. 2d 640, ¶ 19 (citing Thiel, 264 Wis. 2d 571, ¶ 23).
¶ 109. The majority also does not respect the presumption due to counsel — that he acted reasonably. Instead, the majority presumes that Jones is a credible, believable, game-changing witness. The majority concludes that counsel should have known that the jury would have believed her inconsistent, impeachable testimony. The majority does not find it significant that, even assuming counsel knew that Jones would testify as she did at the Machner hearing, counsel would also have to account for Jones' previous inconsistent statements and her involvement in a drug deal that evening. Perhaps even more jugular is that in order for the jury to believe Jones' testimony the jury would have to determine that the police lied and that they failed to include Jones' exculpatory statements in the police reports.[4] To the extent that it can be believed that *221 counsel knew or should have known about Jones' exculpatory testimony, counsel's performance in not calling Jones still was not necessarily deficient. Counsel's decision to not call Jones was just as likely a reasoned strategy.
¶ 110. In its effort to cast counsel's performance as deficient, the majority opinion reads as if counsel did not even try to develop witnesses for the trial. In point of fact, the opposite rings true. In building his trial strategy, counsel testified at the Machner hearing that he "definitely" interviewed Jones as a possible witness, though he could not remember precisely how many times he spoke with her or the substance of those conversations. Jones herself testified at the Machner hearing that counsel had spoken with her a total of four times, twice by phone and twice in person. The record further reflects Jones' only known statements at the time of trial were not exculpatory, and it was not until Jenkins' postconviction motion that Jones was revealed as a potentially exculpatory witness. In fact, since by all accounts counsel did interview Jones, he likely concluded that she was either not exculpatory or not credible. Indeed, at least two other potentially exculpatory witnesses besides McFadden were present at trial, but counsel chose not to call these witnesses because he concluded that they lacked credibility. The presumption due to counsel is virtually nonexistent in the majority opinion.
¶ 111. A lot can happen in two and a half years to change a witness' testimony. The first we know of Jones' potentially exculpatory testimony is at the Machner hearing. The Machner hearing occurred two years and six months after Jenkins' trial. Although counsel did not have detailed recall, as he had lost his file in a flood, it is speculative to assume that Jones' testimony at a *222 trial some 30 months previous would have matched her statement at the Machner hearing. Again, the only-information in the police reports, which were created around the time of the shooting two and a half years earlier, is that Jones did not add to the defense presented. If we afford proper deference to the circuit court, no credible evidence in this record demonstrates that counsel knew, at the time of trial, of Jones' potentially exculpatory testimony. If the majority were to couple the deference due to the circuit court with the presumption due to counsel, it would be hard pressed to conclude that counsel was deficient.
¶ 112. Without presuming that counsel acted effectively, the majority nonetheless concludes that counsel was deficient. In so doing, the majority must speculate that counsel did not have a good reason for not calling Jones and give virtually no weight to the circuit court's determinations, even though that court heard the testimony and reviewed the matter at Jenkins' Machner hearing.
¶ 113. Correctly, the majority does not opine that counsel's performance was deficient with respect to the other two allegedly exculpatory witnesses, Blunt and Moore. According to affidavits attached to Jenkins' motion for a new trial, Moore, Blunt, and Jenkins all shared a jail pod after Jenkins' arrest. Thus, had they testified, the jury would have learned that the defendant was in jail. Jenkins argues that counsel is deficient because while they were in jail together, Blunt allegedly confessed to Jenkins that he was the true perpetrator of the shooting. Moore allegedly witnessed the confession.
¶ 114. Although Blunt later denied having confessed, Jenkins nonetheless argues that Moore's hearsay testimony regarding the confession could have come *223 in under two hearsay exceptions. See Wis. Stat. §§ 908.01(4)(a)1, 908.04(1)(a).
¶ 115. The majority does not contradict the court of appeals' conclusion that Jenkins' trial counsel was not ineffective for deciding not to call Blunt and Moore. State v. Jenkins, No. 2012AP46-CR, unpublished slip op., ¶¶ 20-22 (Wis. Ct. App. Jan. 15, 2013). I agree with the court of appeals' analysis that counsel was not deficient for not calling Blunt or Moore.
¶ 116. The parties stipulated that had Blunt been called as a witness he would have denied knowing Jenkins or anything about the shooting. Id., ¶ 22. Counsel cannot be deficient for failing to call a witness who would have added nothing to his client's case. Id. Thus, counsel's decision not to call Blunt as a witness was not deficient performance.
¶ 117. With respect to counsel's decision not to call Moore, Jenkins conceded that because Moore was in the postconviction phase of his own trial, Moore's attorney refused to allow him to be interviewed or make him available to Jenkins' counsel. This concession reveals that Jenkins' counsel was not deficient in not calling Moore as a witness. Such investigation weighs strongly in favor of constitutionally adequate performance. See Carter, 324 Wis. 2d 640, ¶ 22.
¶ 118. Further, at the Machner hearing counsel articulated a reasonable strategic reason behind not putting the alleged confession into evidence: the confession testimony was not credible and he "didn't want to . . . put a bunch of stuff into evidence that's gonna blow up in our face or make the jury think we're trying to blow smoke at them." Such a decision is a reasonable determination related to trial strategy, and not deficient performance. See Carter, 324 Wis. 2d 640, ¶ 23; Whitmore v. State, 56 Wis. 2d 706, 715, 203 N.W.2d 56 (1973) *224 (holding that "[a]n attorney's strategic decision based upon a reasonable view of the facts not to call a witness is within the realm of an independent professional judgment.").
¶ 119. As a practical matter, this was a difficult case for the defense to build. Witnesses were not exactly cooperative with counsel. Counsel was forced to secure the assistance of Jenkins' sister to try and get witnesses to cooperate in Jenkins' defense. In requesting an adjournment just prior to trial, counsel averred that he had enormous problems in locating possible witnesses and securing their cooperation. Counsel's request for an adjournment was granted. Counsel further testified at the Machner hearing that possible witnesses regularly failed to show up for scheduled meetings, and that they regularly changed their stories from one meeting to the next, making a "multitude" of conflicting statements. All of this speaks to counsel acting in a diligent and professional manner under very difficult circumstances. When a witness does not cooperate, it cannot always be said that counsel is deficient. Here, at most, counsel failed to call a number of witnesses who had given several contradictory statements. Counsel was not deficient for failing to call such witnesses.
¶ 120. Jenkins' defense was that he was not the shooter, and that he was actually across the street at the time of the shooting. Jenkins had a witness who corroborated his testimony, and refuted the sole witness for the prosecution. Counsel described McFadden at the Machner hearing as "quite cooperative and quite credible" and "a good witness, one that's credible as to alibi." By contrast, other possible witnesses had given counsel a "multitude" of conflicting statements. Under these circumstances, why would counsel confuse the jury with cumulative witnesses who had made a number of *225 different, possibly contradictory, perhaps nonexistent, statements over the course of time? Jenkins' counsel introduced what he believed to be a credible witness who supported his defense. It cannot be deficient performance for counsel to decide not to call cumulative, impeachable witnesses who might, in fact, undermine the client's case.
¶ 121. As we have stated, "[a] court must be vigilant against the skewed perspective that may result from hindsight, and it may not second-guess counsel's performance solely because the defense proved unsuccessful." Balliette, 336 Wis. 2d 358, ¶ 25 (citing Strickland, 466 U.S. at 689; State v. Harper, 57 Wis. 2d 543, 556-57, 205 N.W.2d 1 (1973)). Nonetheless, the majority opinion tends to second-guess counsel's actions. Counsel in the case at issue, however, did not render deficient performance as that term has heretofore been defined. Thus, the first prong is not satisfied.
B. Prejudice
¶ 122. In addition to finding that counsel was deficient, the majority must also conclude that Jenkins was prejudiced to the requisite degree. To satisfy the prejudice prong, the defendant must essentially show a "reasonable probability" that the outcome at trial would have been different if counsel had called the witnesses. The majority rests its prejudice determination on Jones' testimony alone. It concludes that her testimony alone, albeit conflicting and contradictory, would have changed the jury's conclusions. For many of the reasons discussed previously, I disagree. Jones' testimony would have, at best, been of minimal assistance to the defense and more likely, been harmful and damaging. I respectfully disagree with the majority's conclusion that Jones' testimony would have affected the outcome of the trial.
*226 ¶ 123. "To warrant setting aside the defendant's conviction, the defendant must demonstrate that his counsel's deficient performance was prejudicial to his defense." Carter, 324 Wis. 2d 640, ¶ 37 (citing Strickland, 466 U.S. at 691-93). "It is not sufficient for the defendant to show that his counsel's errors 'had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). "Rather, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id.; see also Balliette, 336 Wis. 2d 358, ¶ 24. Jenkins cannot make this showing in the case at issue.
¶ 124. The defense strategy was to challenge the identification of Jenkins as the shooter and instead establish an alibi defense. Even if Jones' testimony could have supported both parts of that defense, it is difficult to conclude that, given the significant problems with her inconsistent statements and involvement in a drug deal that evening, her testimony would have been persuasive to the jury.
¶ 125. Even assuming that it was error for Jenkins' trial counsel to not call Jones, Blunt, and Moore, the inclusion of their testimony would not have aided Jenkins' defense to the requisite degree. In the case of Jones, both the court of appeals and the circuit court concluded, "given all her contradictions . . . this court cannot say that there's a reasonable probability that but for not calling her the result would have been different." Jenkins, No. 2012AP46-CR, ¶ 15. I agree.
¶ 126. Jenkins was also not prejudiced by counsel's failure to call Blunt or Moore. As the circuit court properly concluded, Moore's testimony would have been inadmissible hearsay. Jenkins cannot have been prejudiced by counsel's failure to call a witness *227 who would not have been allowed to testify. As for Blunt, the parties stipulated that, had he been called as a witness, Blunt would have denied involvement in the shooting, and would have denied knowing Jenkins. It cannot be said that Blunt's testimony would have changed the outcome of the trial. As such, failing to call him did not prejudice Jenkins. Thus, the second prong is, likewise, not shown.
C. Discretionary Reversal
¶ 127. Jenkins has also asked this court to grant him a new trial under our power of discretionary reversal. See Wis. Stat. § 751.06. Because I conclude that counsel was not ineffective, however, I also conclude that the case at issue was fully tried, and a new trial in the interest of justice is not warranted. See State v. McGuire, 2010 WI 91, ¶¶ 61-64, 328 Wis. 2d 289, 786 N.W.2d 227.
¶ 128. Indeed, when a defendant raises a claim of ineffective assistance of counsel, relief is afforded to the defendant who proves that claim. The interest of justice analysis is not intended as a fallback position for a defendant who does not succeed in a claim of ineffective assistance of counsel. See, e.g., State v. Davis, 2011 WI App 147, ¶ 15, 337 Wis. 2d 688, 808 N.W.2d 130. The interest of justice statute" 'was not intended to vest this court with power of discretionary reversal to enable a defendant to present an alternative defense at a new trial merely because the defense presented at the first trial proved ineffective.'" State v. Neumann, 2013 WI 58, ¶ 146, 348 Wis. 2d 455, 832 N.W.2d 560 (quoting State v. Hubanks, 173 Wis. 2d 1, 29, 496 N.W.2d 96 (Ct. App. 1992)).
¶ 129. Jenkins' assertion is that counsel was ineffective. If he cannot meet that test, he most certainly *228 cannot meet what should be the more stringent standard set forth in Wis. Stat. § 751.06. Wisconsin Stat. § 751.06 is not intended to provide relief for a defendant who cannot meet the burden of showing ineffective assistance of counsel.
¶ 130. For the foregoing reasons, I dissent.
¶ 131. I am authorized to state that Justice MICHAEL J. GABLEMAN joins this dissent.

 The majority opinion does not address whether Jenkins is entitled to a new trial in the interest of justice because it concludes that a new trial is warranted on grounds of ineffective assistance of counsel.

 The majority opinion rests its conclusion of deficient performance solely on counsel's decision not to call Jones. As a result, the majority opinion does not address counsel's decision not to call Blunt and Moore. Majority op., ¶ 9, n.6. Because I conclude that counsel did not perform deficiently, I address all the potential witnesses.

 The record reflects that a "trap" house is a place for young people to "hang out. . . smoke weed [and] drink."

 Other significant Brady implications may also arise given the assumptions made by the majority. See Brady v. Maryland, 373 U.S. 83, 87 (1963).